Good morning, ladies and gentlemen. Welcome to the Ninth Circuit. We just have one matter on today, and we have students here that are observing from USF. Welcome. And so after we finish the case, our law clerks will chat with the students, and then we'll be back out later. Of course, we can't talk about the particular case because the case would got here. I'm sure that that may be the case. So the matter that we have on this morning for calendar is Chad Allen Lee v. Ryan Thornell, 09-99-002. Each side has 30 minutes. If you're the appellant, it's your responsibility to keep track of your time, but I'm looking right at a clock, so if you tell me how much aspirationally you would like to reserve for rebuttal, I'll try to remind you when I see that. But if either I or my colleagues are asking you questions and your time is up, you don't have to ask permission. Just continue to answer the court's questions as long as we have questions, because I'm sure you know we'll be deciding your case. So I want to make sure that my colleagues have all their questions answered. So are we ready to proceed? Good morning, Your Honors. May it please the Court and Mr. Lewis. My name is Tim Gabrielson. I'm from the Federal Public Defender's Office in Tucson and I represent Chad Lee. This is a federal habeas corpus appeal out of the District of Arizona. Chad Lee, preliminarily I have to inform the Court that Chad Lee suffered brain damage from his mother's in utero ingestion of alcohol. He was brain damaged in 1992 when he was arrested for the three homicides that bring us here today. His sentencing judge, and this was prior to Ring, so this would have been bench sentencing back in the 1990s, but his sentencing judge didn't know anything about the brain damage he suffered from the in utero exposure to alcohol. So he had two different trials, correct? And the same sentencing judge, but two separate jury trials on the guilt phase, is that correct? Yes, it is, Your Honor. We had the Ring and then I think the taxi driver on the first trial and then we had a subsequent store. Convenience store, yes, Your Honor. So the after the convictions for the Reynolds and the Lacey homicides, there was a there was an issue passed and then the case, the trial for the Drury homicide took place. And rather than having a full-blown sentencing hearing, defense counsel simply submitted the documents that had been admitted at the first sentencing hearing and that constituted the defense presentation of mitigation at the second sentencing hearing. As I said, what the sentencing judge didn't know was that Chad Lee suffered from fetal alcohol syndrome. Let me ask you this, counsel, because Shin V. Ramirez came down and that's quite a barrier for you to surmount. One of the suggested remedies that you're asking for is a remand for the abandonment theory and the deficient appointment process theory to be considered by the district court in the first instance. But I want to hear from you why it needs to go back. Is there something that you would put in the record that's not currently before this court? Assuming we've even reached those issues, why can't we do so in the first instance here in the circuit rather than send it back? But Judge Nguyen, I will concede that the evidence that was admitted in the Martinez remand litigation is uncontroverted. There's four separate expert witness opinions that were admitted in the district court. But I think your question really gets at how should this court look at Shin V. Ramirez? Is there a remedy that my client can pursue to get the court to consider the new evidence that was presented in federal habeas? Because the evidence of fetal alcohol syndrome, that was not presented. And in my time, I would like to address the deficiency of trial counsel's investigation because I think it's critical to my prevailing on the Strickland claim, the ineffective assistance of counsel claim. But I'm happy to address abandonment. Well, the problem is under Shin V. Ramirez, the Supreme Court has already considered E2 and whether we can even consider the evidence of the fetal alcohol syndrome and all the stuff that the district court looked at for cause and prejudice, you want us to also consider. So we have to deal with Shin V. Ramirez. So I thought that in your supplemental briefing, you had asked that it be remanded, number one, with an order for the district court to grant the petition. And the counsel abandoned him versus ordinary negligence and whether the appointment process was somehow deficient. Now, those arguments were not considered by the district court, right? Correct. So we have to tackle under Shin V. Ramirez, whether we can even look at that evidence in the first instance, which means we have to look at your new theories of abandonment and deficiency in the appointment process. Now, what I'm asking you is, you did ask for remand for the district court to take a look at that. Why should we remand rather than tackle those issues ourselves in the first instance? Because Shin V. Ramirez makes clear that the bar on the admission of new evidence in federal court only kicks in, only kicks in, if the petitioner was deficient in developing the factual basis for his claims in the state court. But as this court's decision in Bradford v. Davis makes clear and the U.S. Supreme Court's case in Maples v. Thomas makes clear, the opening clause of 2250-42 does not even apply if there's abandonment. That's not attorney negligence, Your Honor. Abandonment is something altogether different. That's where there's a severing of the attorney-client relationship. So counsel abandons this client. He leaves his client with no counsel for a period of time. What is your best authority, however, for why abandonment of counsel avoids the Section 2254-E2 bar on expanding the record? What's your best authority for that? It's Bradford v. Davis and it's Maples, Your Honor. Has any court held that those precedents, the abandonment theory, is authority for bypassing E2? I think, Your Honor, that the decision in Shin v. Ramirez, I think, is novel enough that I think there's cases that are maybe percolating below, but none that have reached a circuit court level. But I think the beauty of the common law system, right, is that Your Honors have to adjudicate these things, have to develop the law where the law doesn't presently exist. The only bar to Your Honors doing that is that the ADPA requires that claims be based on Supreme Court precedent, holdings of the Supreme Court. But the ADPA doesn't circumscribe when the court can find equitable tolling, as happened in Holland v. Florida, or where it finds abandonment under Maples. And this court in 2019 decided Bradshaw v. Davis. And that was a case where, similar to what happened in my client's case, counsel didn't file the post-conviction petition that the passage of time resulted in a court making a judgment that there was a procedural default in the U.S. District Court of the petitioner's claims because he never filed a post-conviction petition. But I'm not sure why we should grant your request to remand for the District Court to consider your abandonment arguments when it appears you could have raised abandonment at any point in the five years that this case was back before the District Court on the Martinez remand. Maples, which held abandonment was caused to overcome procedural default, predated Martinez by two months. So I don't know how you get around that. Yeah, I think, first of all, it would have required a stay in the District Court for me to come back to this court, right? Because this court only remanded for consideration of Martinez. It didn't say for the District Court to consider any other cause and prejudice arguments that we might posit. And so when we went back on the Martinez remand, this court's en banc decisions in Dickens and in Dietrich were good law, and they were law that we reasonably relied upon to our detriment when Shin v. Ramirez was decided. But as this court is aware, there were multiple cases, including multiple cases from my office, for which we sought remands pursuant to Martinez v. Ryan from this court. And this court granted, I think all of them got granted, we went back to the District Court. But Dietrich and Dickens gave us very solid legal footing for presenting our new facts to the District Court. And ultimately, in an adverse decision, we'd be back before this court, but we would have that record that would have already been expanded pursuant to Article VII. I mean, you haven't been prejudiced. You've been given the opportunity to brief all these issues here. We gave you the chance to file completely new briefing after Shin, right? And so everybody did that, and that was very helpful. But now we have the arguments, right? We have the arguments here. And the arguments on abandonment, I think there seems to be two issues. One, can you get, is that really an exception to E-2 and Shin v. Ramirez? And two, even if it is, have you adequately shown that there was abandonment here? Why don't you address the second? Because if there wasn't abandonment, then I'm not sure we would need to decide whether abandonment is ever an exception to E-2. I'd be happy to. We're talking about a post-conviction relief attorney named Jess LaRona, who, by the way, was on what I refer to as the Arizona Supreme Court's no-fly list. He wasn't supposed to be appointed in capital post-conviction cases. And the proof is in the pudding here, because he filed a post-conviction petition in the spring of 2000. He had gotten two letters from Chad Lee, and this really is a lot like Holland v. Florida, where the client wrote his lawyer, tried to call the lawyer and say, what are you doing on my case? Time is ticking, and I want to know what claims you're raising. You haven't come to see me. Chad Lee sent a letter to his lawyer saying, you haven't come to discuss the issues with me. Sent two letters. And this, my client is illiterate. Didn't Mr. LaRona answer those letters? And also, didn't he file a petition for review in the Arizona Supreme Court? Yeah, that was after he procedurally defaulted all of Mr. Lee's claims. And just to, it's in the briefing, but I'd like to go over that, Your Honor. I appreciate the opportunity to speak to this, because when Mr. LaRona filed the post-conviction petition, he raised 20 claims that had already been raised on direct appeal and lost, or should have been raised on direct appeal and weren't. And therefore, under Arizona law, those claims were precluded. They were procedurally defaulted. He raised one claim of ineffective assistance of trial counsel, for which he attached no evidence, no certification by the client that those are the claims that the proceedings. So the petition was deficient. Mr. Lewis's present colleague, J.D. Nielsen, filed a response to the post-conviction petition saying, Your Honor, Mr. LaRona hasn't, he hasn't alleged facts in support of the ineffective assistance claims. He hasn't attached any evidence, which is required by Rule 32.5 of the Arizona Rules of Criminal Procedure. I would like the court to give him 30 days to amend his petition. And at that point, Jess LaRona filed a motion for extension of time. He didn't specify how much time he wanted, but he said he wanted an extension of time to cure the deficiencies in his pleading. So that was in late June of 2000. The judge granted LaRona 16 days to July 13th of 2000 to extend the time. Five months passed. Jess LaRona has done nothing. He's done nothing. He's filed nothing with the court. He misled the court into giving him that time because he promised an investigation. He said, I have to investigate, but I'm busy doing a federal trial right now. But Mr. Lee's case requires investigation, so I have evidence to attach to the petition. The investigation never took place, or at least never made its way to Jess LaRona to attach anything. He certainly didn't contact anybody that was steeped in fetal alcohol syndrome disorders. And so in December, on December 29th of 2000, not having received anything from Mr. LaRona, the Superior Court of Maricopa County dismisses Chadley's post-conviction petition with prejudice. It says either the claims are precluded, procedurally defaulted, because they've been raised before and lost, or they're not colorable, which is also a procedural ruling, because he didn't comply with Arizona Rule of Criminal Procedure 32.5. He didn't attach any evidence. He didn't attach a certification. He didn't even make allegations that the court might have considered to get the thing to an evidentiary hearing. So the judge goes ahead and dismisses it out. And Judge Callahan, the question about, well, didn't he petition for review in the Arizona Supreme Court? Yeah, he's a lawyer in private practice. He's a sole practitioner. He needed a bill for something. He needed to get some money somewhere. He was paying bills and things. He didn't do anything at the point in this proceeding that would keep the Superior Court of Maricopa County from ruling the claims procedurally defaulted. That was the critical thing that Jess LaRona had to do after he petitioned the court for time was he had to investigate, he had to attach evidence to his post-conviction petition, or he had to plead anew with evidence that would have supported his ineffective assistance at trial counsel claim. I have to talk to you before our time's up about what's the elephant in the room for me here. And I think it was a little bit of the sentencing judge as well. So when we talk about the fetal alcohol exposure, what I struggle with most is your client was 18 years old and committed three egregious homicides in a less than three-week period of time. But he was 18. He was 19, Your Honor. Oh, by the time? Okay. Well, he was very young. He was very young. And I think that is, too, his mitigating part of it. The crimes themselves, factually, and the sentencing judge noticed this, were very aggravated and very egregious. And I think correctly noted with the first victim, Reynolds, who came out as the pizza delivery woman, but then they decided to kidnap her and sexually assault her. And then they took her to get money out of the ATM. And then they took her back out in the desert and talked in her presence about whether they should kill her or not. And that the judge talked about what abject terror she must have been in. She complied with their sexual assault request, thinking taking the money out of the ATM, then she ends up back and then has to hear that they're talking about killing her, and she tries to get away, and then she gets killed. And then they follow up on that with trying to get rid of evidence as far as that goes. The second crime, while I think the judge correctly noted that in and of itself would not generally be a capital case, because it was the taxi driver and they were trying to rob. But it gets more egregious because your client basically has used, I would call overkill. And then Mr. Jury, the third, that they go in to rob him at the convenience store, but then they just gratuitously, well, your client gratuitously shoots him a whole bunch of times in the head, everything. And so you have three crimes in a less than, in like a three-week period of time that it just doesn't, why did they have to be they seem to be gratuitous killings. And the sentencing judge struggled and said, your client is young, your client was somewhat cooperative with the police, even though he kind of denied complete, took responsibility. And the sentencing judge did know from Dr. McMahon's report that he had a lot of mental and cognitive limitations in front of the court, although it wasn't specific. But the sentencing court just couldn't get past how bad the crimes were and the cover-ups and just everything about the crimes. So why, let's say if we get to your point that the FAE evidence or the fetal alcohol effective should have come in, how do we get past the point that it really would have made any difference with these facts? I concede, your honor, the facts are bad facts to be sure. But this court has held repeatedly that even where the facts are bad, and I'm talking about Mayfield, Hendricks, Caro, there's a bunch of cases that this court has decided that say, in ineffective assistance of counsel claims, even where the crimes are aggravated, there still has to be, there still has to be an individual adjudication of moral culpability consistent with the Eighth Amendment. And that's what's lacking here. The sentencing judge didn't know anything about fetal alcohol syndrome. And let me tell you why that's important, because Judge Natalie Novick-Brown, a preeminent clinician at the University of Washington and a researcher in the area of FAS, she said after interviewing Chad for five and a half hours and evaluating all the other experts' reports, and all the other experts... Oh, they all kick off with Dr. McMahon, right? Who was at the sentencing. He was. I'm not sure what you mean by they kick off with... Well, they start with his, and then they go off from, they accept his as being true, and then they go into their other analysis. They accept him as being true to the extent that the facts had been developed and presented to Dr. McMahon at sentencing. Dr. McMahon didn't know anything about Chad's mother's pervasive, severe alcohol intoxication while Chad was in utero. And let me get, you're asking me a prejudice question, Your Honor, if I'm not mistaken. Let me tell you why this was prejudicial, not to put in the FAE evidence. It's because lay witnesses and expert witnesses said that Chad's emotional functioning was about four years less than what his chronological age was. Okay, he was 19 years old. In fact, Dr. Novick-Brown said he was childlike after her five and a half hour interview with him. If Chad Lee were a year and a half younger, we wouldn't be here because he would not have been eligible for the death penalty, right? I know that, but I guess I'm just saying he planned these things. He shot the people. He seemed to get emboldened as he went along. He seemed to, in some way, it was almost like a spree that he was overkilling these people as far as it goes. He was taking the cylinder off of the gun and getting rid of it that way. He was burying guns. They were burning cars, trying to destroy evidence, like they had watched the forensic files or something, something that we've all seen something about. He wasn't entirely unsophisticated. Does everyone that has fetal alcohol exposure, do they all become serial murderers? No, of course not, Your Honor. I struggle with counsel. It's similar to the area of questioning that Judge Callahan just engaged in. The sentencing court did grapple with a mitigation case and how that stacks up against the aggravating factors. So we're not dealing with a situation where counsel didn't put on a mitigating case. Counsel did, and the sentencing court went through each of those mitigating factors. So you're missing the fetal alcohol syndrome, but I think what really, when I read the sentencing court, what really struck the sentencing court was the degree of active participation that Mr. Lee engaged in versus, you know, there's information that he's a follower and that the 14-year-old was really kind of leading or taking a leading role in these murders, but that really wasn't the case, and the sentencing court recognized that. It was Mr. Lee who shot Reynolds and stabbed her to death to make sure that she was dead. It was Mr. Lee who then fired nine shots at Blasey, four of which killed her. It was Mr. Lee who shot four or five times, a Dory in the head and the neck, killing him. So I think the degree of his active participation is really what makes the aggravating facts particularly egregious. So how do you grapple with that when you're talking about whether this one mitigating fact, the fetal alcohol syndrome, could have overcome all of the other aggravating facts, and particularly the degree of participation that he engaged in? It's not one mitigating fact, Your Honor. It's brain damage that was pervasive and across many spheres of intellectual functioning and adaptive behavior, and I would implore the court, look at Dr. Novick-Brown's report, 2 ER 236 to 76. She lays it out. Anyway, Chad Lee did not have a single criminal conviction prior to the activities in 1992. He had no criminal history whatsoever. He had no criminal history until he started hanging out with a younger group of cohorts led by Scott Hunt. And Mr. Hunt, his list of priors is listed in Dr. Novick-Brown's report. He had ten referrals to the Maricopa County Attorney's Office for criminal prosecutions. He was 14 years old. Chad Lee only developed these thoughts about this social group. He was directed by Scott Hunt. The guns were provided by another one of their cohorts, another 14-year-old named Keith Johnson. All the guns came from Keith Johnson. Chad Lee would not have developed this plan. I think the sentencing judge said he thought maybe Chad Lee wouldn't have developed this plan on his own, but for his connection to Scott Hunt. Scott Hunt was a bad actor. Eventually convicted, sentenced to life in prison, tried as an adult in this case, sentenced to life in prison. Eventually killed somebody in prison, died of a drug overdose. That was Scott Hunt. That was not Chad Lee. Chad Lee didn't have any of those things in his background. And so it wasn't until he started running with this younger cohort. And what's really important... But he was the shooter and the stabber of all of them. He was passive in this. No, but Judge Nguyen asked me who developed the plan. The plan was Scott Hunt's plan. It wasn't Chad Lee's plan. Chad Lee sort of... He gets duped into carrying out Scott Hunt's fantasy, to be sure, when they start doing this so-called crime spree. But those were not Chad Lee's plans. He didn't... And the other mitigation witnesses, the surrogate family that he had that abject poverty and dysfunction in Chad's family home, they talked about how he didn't have a malicious bone in his body. He never raised a hand to anybody. He never committed a violent act. It wasn't until he fell in with this cohort. And what's the main thrust, I think, we've been talking about the prejudice, Your Honor, and I think rightfully so, and we covered some of that in the brief. But Ellen Simpson, the trial lawyer, and this is important to the Strickland claim, what was reasonable investigation here? Because we know from Strickland v. Washington that counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Ellen Simpson had... But Simpson asked McMahon if he had fetal alcohol syndrome, Mr. Lee, and he said no because his face didn't carry certain things. So Simpson did ask that question. You can't get around that in the record. And we have to go back to what was going on in 1994. So he did ask, and the expert that he hired, that other people that still was in the mix said, no, I don't think he has it. No, that was Dr. McMahon. Mr. Simpson filed a verdict in the declaration attached to these proceedings that Dr. McMahon had nothing in his CV that would suggest that he was an expert in fetal alcohol. And the only thing Dr. McMahon found was no dysmorphic facial features. That's for fetal cognitive and behavioral functioning, but it does not have the dysmorphic facial features. But what happened was the investigator that the court appointed to assist Mr. Simpson, Ed Aitken, and this is at 5 ER 1113. I just want to ask you, do you want to save any time for rebuttal? It looks like I'm going to have one minute left for rebuttal, and I'll accept that, Your Honor. Thank you for asking me. Ed Aitken gets appointed to do the investigation for Ellen Simpson. He's a probation officer. He's not a mental health expert, but he does eventually go to Leslie Lee, the mother, and this Q&A happens at the sentencing hearing. Was alcohol abuse an issue with the mother? Answer, yes. Did you receive any specific information concerning her abuse of alcohol during Chad and the other children's development before they were born? Answer, and this is critical. The impression I got from all of the people I talked to and from some who I have not yet mentioned is that Chad Lee's mother abused alcohol for a number of years, including prior to his birth. So you have Dr. McMahon saying whatever alcohol use was de minimis, and most of what he talked about was how it may have affected her abandoning Chad after his birth. But from what this investigator, Ed Aitken, said, he put Mr. Simpson on notice that there is a possibility of neurological defects from severe alcohol intoxication. That's different. That's far different than what Dr. McMahon talked about. Dr. McMahon said no problem here. De minimis use of alcohol. He doesn't suffer from anything. The short of it is the brain damage was the base of Chad Lee's intellectual functioning. The attention deficit disorder that Dr. McMahon testified to, that was merely an overlay. And attention deficit disorder, according to all these experts, that is one symptom of fetal alcohol syndrome. And they would have gotten to that even in the absence of the Dr. McMahon talking about it in his testimony. His testimony was deficient. Alan Simpson was defected because he didn't do a proper investigation. Thank you, Your Honor. Thank you. All right. We'll hear from the government. Good morning, and may it please the Court. My name is Jason Lewis. I'm a Deputy Solicitor General with the Arizona Attorney General's Office, and I represent respondents. Good morning. I'll start in where we left off concerning deficient performance and prejudice. As this Court has said in IRBV, there is no ineffective assistance of experts. I thought that Dr. McMahon did have some experience diagnosing alcohol-related issues. Is that not the case from his CV? Not specific in the field of research as the experts Lee presents now in the new evidence that he presents, but in the context of what was happening in 1994. I'm trying to figure out, like, what would have alerted Mr. Simpson to the fact that this qualified psychologist that he hired was not qualified to basically reach all the diagnosis, and Dr. McMahon didn't recommend that a special fetal alcohol syndrome expert be hired and appointed. In other words, the record was there. They knew that there was alcohol used during pregnancy, but what would have alerted counsel to the fact that Dr. McMahon wasn't enough and that another expert needs to be appointed? I don't think anything reasonably could have alerted Mr. Simpson that he needed to retain a specialist in this field. This was 1994. Awareness, especially in the Arizona community, was only beginning to exist that fetal alcohol syndrome was something that could be diagnosed into adulthood. And as the district court pointed out, and it's ruling on the merits here, the trial counsel was actually pretty on top of things to recognize that fetal alcohol syndrome or fetal alcohol effect could be at issue. What we see in the new materials from Lee is a memorandum from investigator Ed Aiken, and it has a little handwritten note, and it says, our suspicions of the alcohol disorder may be right. This is fertile ground for Mickey, Dr. McMahon to explore. So they were doing the investigation, and Attorney Simpson and Ed Aiken were both aware that fetal alcohol syndrome or fetal alcohol effect or whatever it was coined at the time was something that they should look out for. They did the investigation there. Ed Aiken went out and interviewed the family, developed a pretty comprehensive social history of Lee, and took that information to Simpson, who then went to McMahon. They relied on their I think favorable opinions from, especially in the context of the trial, when they presented Dr. McMahon's testimony at the voluntariness hearing. At the time of this, they did have an understanding that the mother was drinking heavily while she was pregnant? Yes, that's right, and that's Ed Aiken's testimony at the mitigation hearing. Was there new evidence, more evidence later learned about the extent of her drinking, or was the extent of the drinking known at the time of the sentencing? I think the extent of the drinking at the time of the sentencing was based on collateral information from the family members. Lee's mother was always seen with a beer and a cigarette, these kind of things, and statements that she drank during his birth. Now what we have is, I believe, an affidavit from Lee's mother herself saying that she drank during her pregnancy with Lee. That is new. I believe so. I'd have to go back to the ERs, but I believe that's the case. This court's held that neurological brain damage can be particularly compelling mitigation evidence. Why wouldn't evidence of brain damage to Mr. Lee have made a difference at his sentencing? I believe the sentencing court had a pretty fair picture of Lee's functioning. Judge Reinstein, who is the sentencing judge in Maricopa County, was aware, for instance, that Lee had trouble in school, that he had a learning disability, that he suffered from maternal and paternal abandonment, that based on the instruments Dr. McMahon administered to Lee, that he had difficulties processing information, that he sort of had a tentative grasp on reality at times. The sentencing court knew these things about Lee, that he had these difficulties in life, that he had these difficulties in his mental functioning. All the sentencing court didn't have was a formal diagnosis of FAE. Well, counsel's point is that his brain damage was such that it actually would put his age at a much younger, I mean he was 19 at the time, so if you just back up his age by a year or so, he wouldn't even be qualified for the death penalty in the first place. So that essentially, I mean we've talked a lot about how aggravating the aggravating factors are, but had the court known that, that he would essentially, potentially not even be eligible for the death penalty, wouldn't that weigh much larger than the other mitigating factors that were presented by Mr. Simpson? Well, I mean the question of eligibility, I mean the Supreme Court and Roper, you know, it's 18, 18's 18. They don't want to draw on anywhere, but if they have to draw it, it's got to be at 18. But aside from that, you have... Sure, I think counsel said that he's functioning four years younger than he actually was. Sure, I mean that's, you know, in Arizona, and the Supreme Court hasn't recognized that the sort of functional equivalent can exempt someone from eligibility for the death penalty. But I think a lot of what Judge Callahan is asking about, the degree of Lee's culpability in these three killings, the degree of his participation in planning, it would have cut against any additional mitigating evidence of FAE. We don't see a one-off here. This isn't just David Lacey or Harold Drury or Linda Reynolds. This is three awful murders in succession over 21 days. The premeditation is high. In both Linda Reynolds' case and in David Lacey's case, they placed the phone call to lure the victim to a location so that they could carry out the crimes. Obviously, Lee came armed, and he used those weapons that he brought. And in Linda Reynolds' case, the firearm he brought and shot her with execution style wasn't enough. He went back to the car and retrieved a knife to stab her two times in her chest cavity. You know, as Judge that, the sentencing court would not have reasonably credited a diagnosis of FAE to mitigate enough that it was sufficiently substantial to call for leniency and not to impose death sentences here. I take it under Arizona law, although you can't, you know, completely exclude mitigating evidence based on a lack of a causal nexus, you can give it reduced weight, and that was the law of Arizona at the time. Right. And we've seen, you know, I think in Headland, this court has reaffirmed that principle that sentencing authorities, in this case a sentencing court, are entitled to assign what weight they deem appropriate for mitigating evidence. But in Arizona, you know, and under Supreme Court precedent, we can't just categorically exclude certain types of mitigating evidence. And if that's a good segue, Judge, I can get into the causal nexus claim if you've got questions. Well, I do actually want to ask you about the abandonment issue. So my opposing counsel says, look, number one, that you can get around E-2 through this abandonment theory, and number two, there was abandonment here. So why don't you respond on both those? You know, I think whether or not E-2 applies, the respondents submit that E-2 still forecloses the admission of new evidence for the federal claims, even if abandonment excuses a procedural default. It's essentially the same situation we saw between Martinez and then Ramirez. The court was pretty clear on Ramirez. Right, unless you thought there was something just materially different about abandonment. You know, in the sense of Maple's abandonment, you know, where the claims are not raised at all because the defendant there had no counsel in those proceedings and nothing could have been developed, because then you're not dealing with negligence, right? I don't really have a good answer for whether or not, you know, if you found abandonment, why, you know, E-2 wouldn't foreclose the consideration of the new evidence, but I do have good reasons for why abandonment didn't happen in this case. Can I have you back up for just one moment? Counsel did ask for remand, but as I understood it from counsel's, your opposing counsel's argument, there was nothing that he would put in the record that's not already before us. I don't know that we need to really tackle the abandonment issue or whether it's enough to overcome 2254 E-2, but if we were to reach it here in the first instance and not go back, is that your view? Oh, I think that's right, Judge. All the record you need is that Lerona filed claims in his petition for post-conviction relief and sought review of the denial of those claims in Arizona's highest court. He preserved those claims for federal review. He continued representing Lee in state post-conviction proceedings. That alone—  I believe so, Judge. Getting to abandonment, this is not the case where counsel didn't do anything at all. He did, within weeks, get the files, get an investigator, met with him regularly and the like, but counsel did point out the numerous ways in which his performance was very deficient. Where is that line between garden variety negligence versus total abandonment such that it may sever that attorney-client relationship? I don't think that abandonment can exist where a lawyer has raised some claims, regardless of how bad those claims are. If the lawyer is there in post-conviction alleging some claims and, indeed, preserving some of those claims for federal review, then it's just different from Maples, from what the court found in Maples. You know, there, the New York attorneys representing Maples left the firm. All the notices went to them. Maples didn't know about that. Maples didn't know he didn't have counsel. Maples didn't know that he was missing deadlines to preserve the claims that were brought up in the initial filing by those New York attorneys. Local counsel wasn't communicating with Maples. The court wasn't communicating with Maples. He lost all those opportunities because nobody was advocating on his behalf. Lee sort of tries to draw the line between that communication and what happened in Holland, that, you know, the lack of communication between himself and Attorney LaRona is enough to find sort of this, you know, equitable remedy of abandonment to excuse the procedural default of claims. But as Judge Callahan pointed out, LaRona responded to his letters. Lee was apprised of his proceedings, maybe not within the time that he wished to be apprised of them, but he was. And, you know, LaRona filed a petition for review in the Arizona Supreme Court. I go back to that. That alone makes it a different case than what happened in Maples. As we answered in our replacement pleadings, that might be negligence, but that's certainly not abandonment. And, you know, under Coleman, attorney negligence and post-conviction can't excuse the procedural default of a claim. Let me ask you about, I see that in the new FAE evidence submitted to the district court, trial counsel Mr. Simpson declared that he did not pursue a fetal alcohol effect theory because Dr. McMahon ruled out FAE as a diagnosis. Does Shin V. Ramirez bar us from relying on the declaration to hold that Mr. Simpson was not ineffective under our precedent, that counsel need not seek a second opinion? Is there any basis in the record before the state court that Mr. McMahon affirmatively ruled out an FAE diagnosis for Mr. Lee? No, I don't think we have that in the state court record. I believe, you know, what we have now is attorney Simpson's affidavit. We have the handwritten notes by the Martinez litigation. So on the state court record, what we have is Aiken's testimony at the mitigation hearing and Dr. McMahon's testimony at the mitigation hearing along with Simpson's memorandum submitted to the sentencing court and some letters that were submitted either through Simpson or through the probation office. So are we limited to that? I mean, E2 would certainly preclude the consideration, but even if you can't consider those things that, you know, I'm sorry, that they had, you know, conducted this investigation, I think there's still the reasonable inference that they did conduct the investigation because Aiken testified about it to the sentencing court. So we can make that inference that they conducted the investigation at least because they knew about it and they presented it to the sentencing authority. We don't have the contemporaneous thought about this is our suspicion of the alcohol syndrome, these sorts of things. But I think there's enough on the state court record to find on the underlying IEC claim that trial counsel did not render deficient performance. And as I previously discussed, even if he was deficient, there's no prejudice here because in consideration of the aggravation of the three murders and Lee's degree of participation and his degree of culpability, there would be no prejudice even if an FAE diagnosis was presented to the sentencing court. So does the state carry some burden to show that any causal nexus error was harmless? What is your best argument to support that? Do we carry the burden here or do we in general have to prove harmlessness? Well, do you have some burden to show that any causal nexus error was harmless? I believe so. I think that's what this court has said. You know, if you want to get to the harmlessness inquiry, it ties into the prejudice discussion for the FAE evidence because it concerns the scope of aggravation present. There were four aggravating circumstances for both Linda Reynolds' murder and Harold Drury's murder. At the time in Arizona, there wasn't a sort of contemporaneous murder aggravating circumstance, but there was the F-1 aggravating circumstance, which is a prior conviction for an offense punishable by death or life imprisonment. As I mentioned before, these three killings occurred within a span of 21 days in sort of a spree of criminal conduct. The sentencing court in its pronouncement and special verdict was very clear that its determination, even considering all the mitigation presented by Lee, would not have changed, that Lee was deserving. Didn't the sentencing judge also come up on the first PCR? Wasn't that the same judge? Correct. Judge Reinstein also presided over Lee's initial petition, and I believe at least the first successive petition. So, in considering Lorona's performance, I think that is important to note because you're faced with the same judge that presided over the trial that was complementary to Simpson at trial, and that appeared, I mean, from as much as you can tell from a cold record, that appeared to really struggle with the determination that he had to make. He gave very careful consideration to Lee's mitigation. In terms of the causal nexus claim, I don't think there's any real good argument here that the trial court required a causal connection between the proffered mitigating evidence and the crimes that Lee stood convicted of. In fact, in I believe one of the ineffective assistance of counsel claims in the first petition for post-conviction relief, Judge Reinstein, again the same sentencing judge, found that Simpson was not ineffective for failing to draw a causal connection between certain evidence and the crimes because the court considered the mitigating evidence and weighted appropriately. So, we do in that first ruling on the initial petition for post-conviction relief, we do get an insight into the sentencing court's evaluation of the mitigation evidence. And Reinstein said that nothing would have changed his mind. Well, you know, he makes these statements that, you know, even if he found all the mitigation presented proven in consideration of everything, that he still would have sentenced Lee to death in all three matters. So, you know, we have that statement in the sentencing pronouncement and in the special verdict. But this evidence has not been presented to the state court and for Reinstein to do a re-weighing. So, pre-ring, obviously, it was a judge that imposed death. So, the standard now after that, we have to look to, would a juror, would a reasonable juror have seen it otherwise when we're evaluating prejudice? What's the standard pre-ring? For the... For prejudice, just say... For prejudice? Yeah. Okay. I believe it's a... Because we only have a judge doing it. So... I don't have a note here that really helps me answer your question whether it's a subjective or an objective standard. But I believe even under an objective standard, any reasonable sentencing court would not have changed its determination that Lee would be, that Lee should be sentenced to death in all three matters. Because as this court has said in Hedlund, Arizona courts are still permitted to assign whatever weight they feel is appropriate for certain mitigating evidence. They just can't refuse to consider it entirely. So, a court could still, or even a sentencing jury could still say, well, I'm considering this mitigating evidence, but I just don't feel like it really strongly explains why what happened, happened. But you used the 1994 standard, not the post-ring. Right. Because we're dealing with a sentencing court. Okay. I would like to back up on the causal nexus claim and get into the language in the Arizona Supreme Court's first opinion. So, Lee won. And the, I think, language there that suggests some sort of error could have occurred was further defendant has failed to establish a nexus between his deprived childhood and his crimes. As respondents argue in their answering pleading, Lee had asked on direct appeal and had alleged that the sentencing court abused its discretion by failing to give evidence of his dysfunctional family upbringing more weight in its consideration. The Arizona Supreme Court's statement in this regard, saying that Lee had failed to establish a nexus, was in response to that claim, that the sentencing court had abused its discretion. What we see in these cases is, and I think some of the biggest offenders where this court has granted relief, you have the sentencing. So, are you saying that was kind of an unfortunate statement taken out of context? Because it does seem to say they, Lee, quote, failed to establish a nexus between his deprived childhood and his crimes, unquote. So, that sort of sounds like the wrong standard. Well, and you know, if you look to the paragraph before that, it does address Lee's argument that the sentencing court abused its discretion by not giving more weight to the deprived childhood. Yeah, they rejected it to, quote, give greater weight to his deprived childhood. So, you say... Right, and because it's really two claims. I mean, you know, first that the sentencing court abused its discretion by not giving it enough weight, but then also an argument saying, on independent review, you, Arizona Supreme Court, should give it more weight, because this is something you're permitted to do through that independent review mechanism. So, I think the court, in its opinion, and Lee, one, is tying together those two things. First, you know, there's no abuse of discretion for the court not giving more weight to this mitigating factor. But also, we're not going to give it more weight than the trial court gave, the sentencing court gave, because there's not a clear nexus between the deprived childhood and the crimes, which courts in Arizona and anywhere are still entitled to do. They just can't totally preclude the consideration of such mitigating evidence. Because, you know, if you look at the post-McKinney decisions, you know, post-Tenard, post-McKinney decisions from the Arizona Supreme Court, they still say, well, you know, we have to consider this, of course, under lock-in nettings, but it's just not entitled to very much weight in Arizona, and, you know, here's our case law that describes why. Concerning the case law, too, you know, in APEL, this court kind of gave a little checklist for these types of claims. You know, one, where the trial court, there's no error where the trial court didn't make a factual conclusion regarding the causation, you know, the causal nexus. Two, where the Arizona Supreme Court didn't make a factual conclusion regarding the causal nexus. And three, where there's no citations to State v. Ross and State v. Wallace. I think we've kind of talked about those factual determinations. It certainly didn't happen with the sentencing court here. The sentencing court considered and gave weight to everything that it found proven, offered in mitigation. Even if it's arguable that the Arizona Supreme Court did something here, and I would submit that the Arizona Supreme Court did not require a causal nexus for the consideration of the dysfunctional or deprived childhood on its independent review, there's still no citation to these sort of keystone causal nexus cases, State v. Ross and State v. Wallace. We do have a citation in the second Lee direct appeal opinion, State v. Stokely, and I just wanted to clear that up with the court. When the Arizona Supreme Court cites Stokely in that opinion, it's citing it for the proposition of what the Arizona Supreme Court's review looks like on independent review. It's not citing Stokely for some proposition that, you know, a tough family background can't be considered mitigating if there's no causal nexus. So Stokely is not cited for that proposition, and I don't think, you know, its citation for a different proposition should put it into the bucket of cases where causal nexus error occurred. Just a moment, Judge Isall. Do either of my colleagues have any additional questions? It's your time, but we don't have any additional questions. My wife always says I could go on for a long time, so I won't bore you with that. But if there's no additional questions, respondents would just respectfully request that this court affirm the district court's denial of habeas relief. Thank you. Thank you for your argument. Your Honor, I'd like to talk first about Maples and whether it provides support for getting around the 2254E2 bar. Maples could not have been decided the way it was. The Supreme Court said that the procedural default of an ineffective assistance of counsel claim is excused. Claims are made up of two things. It's the claim and it's the facts. So the U.S. Supreme Court was saying, yes, come back to federal court and you can present your claims and your facts there. So I just wanted to clear that up. That's kind of like the argument that was made in Shin v. Ramirez, right? I mean, pretty much the same argument was made there about ineffective assistance and you're going to need the record to demonstrate that, and the Supreme Court said no. No, I think, Your Honor, Judge Bress, I think here's the problem. There's an opening clause to 2254E2, and it has to do with whether the petitioner has been diligent in developing and presenting his facts in support of his claims. If he's not diligent, generally, that's attributed to him, whether it's his lawyer or not. But in the abandonment area, those abandonment cases say that 2250E2 is not violated where the petitioner comes back and he's trying to prove his equitable tolling under Holland v. Florida or the abandonment under Maples v. Thomas. I see my time is up. If I could have 30 seconds just to say that. I think this Court can decide the abandonment issue on this record, but I think beyond that, on the ineffective assistance claim, Alan Simpson, the trial lawyer, he signed a declaration that casts some doubt on facts that need to be determined where he says, I didn't talk to Dr. McMahon. Dr. McMahon's CV didn't say anything about his being an expert on fetal alcohol disorders. I think that's an area that's ripe for an evidentiary hearing to find out, unless the State concedes, but if Simpson is telling the truth about how Dr. McMahon didn't know anything about the fetal alcohol syndrome based on the paucity of facts that Alan Simpson developed in the investigation of social history, there's nothing in this record that suggests that on fetal alcohol syndrome. As I said before, the dysmorphic facial features only affects fetal alcohol syndrome. That's the most extreme form of in utero alcohol abuse. Fetal alcohol effect, if Dr. McMahon knew anything about that, it has nothing to do with dysmorphic facial features or limitations on height and how wide the eyes are and things like that. So Dr. McMahon, while he might have told Alan Simpson that Chad didn't have FAS from his observation of him as a 20-year-old man, Dr. McMahon didn't say anything about fetal alcohol effect, and it's not clear on this record he knew anything about fetal alcohol effect. And I think we need an evidentiary hearing just to prove what Mr. Simpson knew or didn't know at the time. Thank you, Your Honor. This matter will stand submitted. The court will be in a brief recess. We'll be back out to talk to the students briefly, but in the meantime, our law clerks will converse with you.
judges: CALLAHAN, NGUYEN, BRESS